## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No.  _____

**TRICIA GUNNESS GONZALEZ**,

     Plaintiff,

v.

**BALFOUR BEATTY INVESTMENTS, INC.;**
**BALFOUR BEATTY MILITARY HOUSING MANAGEMENT LLC;**
**BALFOUR BEATTY COMMUNITIES, LLC;**
**FORT CARSON FAMILY HOUSING, LLC;** and
**DONALD SHELTON**

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

### I. INTRODUCTION

1. Plaintiff Tricia Gunness Gonzalez ("Plaintiff") worked for Defendants from around April 18, 2022, to August 31, 2023, most recently as a Service Center Manager.  Plaintiff, who at all times satisfactorily and successfully performed her job, was subject to discrimination, harassment, and retaliation during her employment with Defendants on the basis of her race, disability, and sex.

2. Plaintiff brings this suit to address Defendants' unlawful actions as described herein.

### II. JURISDICTION AND VENUE

3. Plaintiff brings this action, by and through counsel, against Defendants Balfour Beatty Investments, Inc.; Balfour Beatty Military Housing Management LLC; Balfour Beatty Communities, LLC; Fort Carson Family Housing, LLC (collectively "Balfour Defendants"); and Donald Shelton ("Shelton") (collectively, "Defendants") pursuant to

this Court's federal question jurisdiction, 28 U.S.C. § 1331, under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (hereafter "ADA"), the ADA Amendments Act of 2008, Pub.L. No. 110–325 § 2(b)(1), 122 Stat. 3553–3554 (2008) (hereafter "ADAAA"), as well as this Court's supplemental jurisdiction, 28 U.S.C. § 1367, to bring claims against Defendants under the Colorado Anti-Discrimination Act, C.R.S. § 24-34-402 et seq. (hereafter "CADA"), all of which prohibit discrimination, harassment, and retaliation on the basis of race, sex, disability, and engaging in protected activities to complaint about such unequal and discriminatory treatment.

4. Venue lies with this Court pursuant to 28 U.S.C. § 1391(b)(2) as the actions giving rise to this litigation occurred in Colorado Springs, Colorado.

## III. PARTIES

5. Plaintiff is an individual who was an employee of the Balfour Defendants identified below and at all relevant times resided in El Paso County, Colorado.

6. Defendant Balfour Beatty Investments, Inc. is a Delaware limited liability company with a principal office at 1 Country View Road, Ste. 100, Malvern, PA 19355, which was doing business at 6800 Prussman Boulevard, Fort Carson, CO 80913.

7. Defendant Balfour Beatty Military Housing Management LLC is a Delaware limited liability company with a principal office at 1 Country View Road, Ste. 100, Malvern, PA 19355, which was doing business at 6800 Prussman Boulevard, Fort Carson, CO 80913.

8. Defendant Balfour Beatty Communities, LLC is a Delaware limited liability company with a principal office at 1 Country View Road, Ste. 100, Malvern, PA 19355, which was doing business at 6800 Prussman Boulevard, Fort Carson, CO 80913.

9. Defendant Fort Carson Family Housing, LLC is a Delaware limited liability company with a principal office at 1 Country View Road, Ste. 100, Malvern, PA 19355, which was doing business at 6800 Prussman Boulevard, Fort Carson, CO 80913.

10. Defendants Balfour Beatty Investments, Inc., Balfour Beatty Military Housing Management LLC, Balfour Beatty Military Housing Management LLC, Balfour Beatty Communities, LLC, Fort Carson Family Housing, LLC are collectively referred to as "Balfour Defendants."

11. Upon information and belief, Balfour Defendants were joint employers of Plaintiff. Balfour Defendants shared or co-determined matters governing the essential terms and conditions of Plaintiff's employment. Balfour Defendants directed, controlled, or maintained the right to control and supervise the administrative, managerial, and employment duties of its agent(s), other non-principal Balfour Defendants, and workers, like Plaintiff, in the operation of the Fort Carson's maintenance and leasing office, fortcarsonfamilyhomes.com, commonly known as "Balfour Beatty Military Homes." In addition, Balfour Defendants, in their capacity as principal and master of its agents, are joint employers of Plaintiff and directly and/or vicariously responsible for the acts of Balfour Defendants.[1]

---

[1] In their response to the Colorado Civil Rights Division, Balfour Defendants' attorneys argued, without the presentation of substantiating evidence that,

*Balfour Beatty Communities, LLC was Charging Party's W-2 employer and the one and only proper party to Charging Party's charge. Balfour Beatty Investments, Inc. is the parent company of the LLC. Balfour Beatty Military Housing Management, LLC is the owner of privatized housing at Fort Carson and had nothing to do with Charging Party's employment with the LLC. Fort Carson Family Housing, LLC is the owner and operator of privatized family military housing with the Department of Army and likewise had nothing to do with Charging Party's employment.*

12. Defendant Donald Shelton was, at all relevant times, Balfour Defendants' Regional

Manager, supervisor, and held authority, direction, and control over Plaintiff, and a proxy

of Balfour Defendants, and worked at 6800 Prussman Boulevard, Fort Carson, CO 80913

during the relevant period of time in this Complaint.

13. At all relevant times and upon information and belief, Balfour Defendants employed well

over 500 employees across the United States.

14. Upon information and belief, Defendants directed, controlled, or maintained the right to

control and supervise the administrative, managerial, and employment duties of Plaintiff.

15. Upon information and belief, Defendants held authority, direction, and control over

workers such as Plaintiff, in her employment.

---

However, such a conclusion <u>cannot be made at this time</u> as, for instance:

- Plaintiff's paystubs clearly state "Employer Name: Balfour Beatty Military Housing
  Management LLC" – not Balfour Beatty Communities, LLC;

- In the only email (a 1-page, incomplete email chain) presented in rebuttal to the CCRD
  by Balfour Defendants, on August 15, 2023, Doug Merrifield, an "HR Business Partner"
  of "Fort Carson Family Homes" (<u>not</u> Balfour Beatty Communities, LLC), provided
  (allegedly) meaningful input into Plaintiff's employment.

- When Plaintiff attempted to re-apply at Fort Carson following her termination for the
  Customer Experience Manager position (in the same Fort Carson office and performing
  practically the same duties as she held in her previous position with Balfour Defendants
  at Fort Carson), the position was offered by "Balfour Beatty Investments" again, not
  Balfour Beatty Communities, LLC.

This above contradicts Balfour Defendants' *argument* that the other entities were not Plaintiff's
employer. As such, whether all, some, or just one of the Balfour Defendants (or some other
defendants related or not related to the Balfour Defendants) are Plaintiff's employer is a question
of fact to be determined through discovery.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

16. On October 31, 2024, the Colorado Civil Rights Division ("CCRD") mailed, and Plaintiff subsequently received, five (5) "Notice of Right to Sue" letters for CCRD Charge No. E2400021848 against Defendant Balfour Beatty Investments, Inc. (**Exhibit 1**), CCRD Charge No. E2400021233 against Defendant Balfour Beatty Military Housing Management LLC (**Exhibit 2**), CCRD Charge No. E2400021846 against Defendant Balfour Beatty Communities, LLC (**Exhibit 3**), CCRD Charge No. E2400021849 against Defendant Fort Carson Family Housing (**Exhibit 4**), and CCRD Charge No. E2400022028x against Defendant Donald Shelton (**Exhibit 5**), resulting from Plaintiff's Charges of Discrimination which pleaded actual and abetting discrimination, harassment, and retaliation on the basis of race, sex, disability, and engaging in protected activities (e.g., complaining about such unequal and discriminatory treatment). These Notices entitle Plaintiff to initiate this action within 90 days of receipt of said notices.

17. Plaintiff has satisfied all administrative and judicial prerequisites necessary for this action.

## V. GENERAL ALLEGATIONS

18. Plaintiff, who identifies as a Black woman, worked for Defendants from around April 18, 2022, to August 31, 2023, first as a Service Center Coordinator and was promoted and working as a Service Center Manager at the time of her unlawful termination.

19. At all times during her employment with Defendants, Plaintiff satisfactorily and successfully completed her job duties.

20. Defendants' Regional Manager, Shelton, who reported to Defendants' Vice President, began working onsite with Plaintiff on or around early June 2023 – allegedly to be assigned by Balfour Defendants to lower the location's work order percentage.

21. Upon information and/or belief, Shelton had been frequently moved around by Balfour Defendants because of his inappropriate actions and comments made at other locations Shelton worked at, as described herein.

22. Upon information and/or belief, Balfour Defendants valued Shelton because of his ability to lower open work order percentages at different facilities, which as described below was actually because of his ordered or demanded falsification of work order closures, which put Balfour Defendants in a favorable light with the U.S. military.

23. Beginning on or around early June 2023, Shelton would make unwelcome and sexually explicit comments to Plaintiff and other employees:

   a. Shelton told Plaintiff that Shelton's mother thought he was a girl because his penis was so small, and then stated that he does not have this problem: "Trish do you know my mother thought I was a girl when I was a baby, because my dick was to small but guess what I don't have that issue."

   b. Shelton walked into the communications office and sang a song with lyrics "To the window to the wall... till sweat drops down my balls."

   c. Shelton made comments to Plaintiff after Assistant Facility Director Desiree would leave: "I cannot begin to tell you what I would do to her if I get my hands on her," while he would lick his lips and rub his hands together.

   d. Shelton shared sexual acts he was caught doing behind his ex-wife's back.

    e.   Shelton would make accusations about Assistant Facility Director, Desiree, having sexual relations with others and more generally he would always question other employees' friendships and start rumors about employees having sexual relationships.

    f.   When Plaintiff asked for a raise, Shelton made a sexual innuendo that a raise for Plaintiff would take "some pull" with a sexual insinuation.

    g.   Shelton would disparage Doug in Human Resources and accuse him of being gay.

24. Beginning on or around early June 2023, Shelton would make racist comments to Plaintiff and other employees:

    a.   Shelton made fun of Operation Manager Aymesha Melendez, saying she looked like the black version of Side Show Bob (a Simpsons character).

    b.   Shelton stated to Plaintiff that black people do not know how to act when they are in high positions, that black people should not be managers, that problems happen when you put black people in charge, and that he wanted to fire other black employees (Scott Jennings and Aymesha Melendez).

25. Beginning on or around early June 2023, Shelton would make discriminatory comments or actions against Plaintiff and other employees:

    a.   When employees called out sick, Shelton would disparage them and say they are lazy and did not want to work.

    b.   When Plaintiff requested accommodation for her ongoing medical condition (herniated/bulging discs in her lower back and neck), he made fun of Plaintiff , refused to consider a new chair for Plaintiff, and did nothing to provide any accommodation for her.

    c.  When Plaintiff took leave to deal with her medical condition Shelton would accuse her of being lazy and demand she immediately come back to work or else.

26. On August 29, 2023, Shelton came to Plaintiff's office and demanded that she drop Balfour Defendants' work order percentage by 2 points, meaning that Shelton wanted Plaintiff to artificially reduce (simply close) the number of work orders (e.g., repair and maintenance tickets) on Fort Carson by 2 points, offering no means to do this.

27. Plaintiff said she would review the work orders and try (e.g., maybe there were open work orders that had previously been resolved, but not closed, and those could be closed immediately).

28. Shelton then told Plaintiff to follow him and when Plaintiff got into his office, Shelton said Plaintiff was out yesterday with "so called back pains" so Plaintiff MUST do it. Shelton said Plaintiff was being "ordered" from Defendants' regional office to reduce the work orders, even if such reduction was unlawful.

29. Shelton went on to say he had been in this "shithole" for months and he had been sent there to make things better, therefore Plaintiff must do as he states – even if such action was illegal.

30. Plaintiff refused to take the illegal action Defendants were demanding of her, and after being verbally abused by Shelton on August 30, 2023, Plaintiff decided to report Shelton.

31. On August 30, 2023, Plaintiff called Balfour Defendants' Speak Up line, which is supposed to be an anonymous complaint line.

32. Shelton had previously stated that if anyone ever called the Speak Up line that he would know, because he had inside sources; by this time, however, Plaintiff had enough of Shelton's wrongful demands, discriminatory, and harassing behavior.

33. Fearing retaliation, Plaintiff asked many questions to feel secure that Shelton would not find out that Plaintiff called the Speak Up line.

34. The Speak Up representative assured Plaintiff that Shelton would not know that she called and complained against him – which was not true.

35. Plaintiff proceeded to file her complaint against Shelton with Balfour Defendants, which included complaints about Shelton's discriminatory and harassing behavior.

36. On the morning of August 31, 2023, Plaintiff viewed her complaint online and saw it was "viewed" at 8:13am.

37. When Plaintiff arrived at work and Shelton said nothing to her, Plaintiff knew her worst fear had been realized, and that Shelton knew she had complained against him.

38. Around noon on August 31, 2023, Shelton walked by Plaintiff and stated, "today will be the best day of my life."

39. Around 2pm or 3pm on August 31, 2023, Shelton asked Plaintiff to come to the local Field Director Scott Jenning's office.

40. Plaintiff went into Scott Jennings' office and was greeted by Doug Merrifield, Balfour Defendants' Human Resources representative, and Shelton. Shelton told Plaintiff to have a seat and told her that her position had been eliminated and smiled.

41. Plaintiff asked if there were any other positions that she would be qualified for and Shelton stated "Nope your time has ended here with this company, no positions available. This was being discussed for months."

42. Shelton told Plaintiff he "fought hard" and got Plaintiff four weeks of severance pay (which was not true).

43. Plaintiff asked how many weeks of work she had left, and Shelton stated "You leave now. You will have a few minutes to get your personal belongings and will be escorted out."

44. Plaintiff asked if she could say goodbye to everyone she worked with the last 20 months, and Shelton said no.

45. Plaintiff walked to her desk, embarrassed and humiliated, while her coworkers watched her get escorted out of the door like a criminal.

46. On August 31, 2023, the day after Plaintiff called Balfour Defendants' Speak Up line and complained against Shelton, Plaintiff was terminated and purposely embarrassed as she was kicked out of the facility.

47. Plaintiff left the office with no paperwork, no termination paperwork, no final payment (as required under Colorado law), and no alleged severance agreement.  If Plaintiff's termination was "discussed for months," as Shelton had stated, why weren't those things available and provided to her?  Shelton had again lied.

48. As Plaintiff later learned, Scott Jennings, and local Operation Manager Aymesha Melendez and Assistant Field Director James Randal all confirmed that none of them were aware of Plaintiff's termination until 10 minutes before Plaintiff found out.

49. After Plaintiff arrived home that afternoon, she received a call from VP Human Resources Kelly, who told Plaintiff that she'd get back to Plaintiff on September 5, 2023, to discuss severances.

50. During this call, Plaintiff was informed that Shelton had been suspended.

51. Plaintiff later learned that in the weeks after her termination, Balfour Defendants fired Shelton.

52. At no time did Balfour Defendants offer Plaintiff her position, or any position, back to work.

53. At all times Balfour Defendants stood by, condoned, and adopted Shelton's actions, which Plaintiff believes knew of his discriminatory, retaliatory, and harassing behavior to herself and other employees, but kept Shelton in a management position, supervising Plaintiff and others, and engaging in discrimination/retaliation/harassment on behalf of himself and Balfour Defendants.

54. On September 19, 2023, Balfour Defendants sent Ms. Gonzalez a "Separation Agreement and General Release" (which she never executed), stating:

   a. that her last day of employment was "September 19, 2023"

   b. offering to pay her $4,616, less lawful deductions in exchange for a full and final general release of all claims Plaintiff had or could have against Balfour Defendants, a non-disparagement provision, and governance under Pennsylvania law.

55. Around September 20, 2023, Balfour Defendants affirmed Ms. Gonzalez's termination, on September 19, 2023, and provided her a "Personnel Action Form – Termination" form indicating:

   a. Plaintiff's termination was "Involuntary" - "Compulsory Redundancy/Lay Off/Reduction in Force"

   b. "Last Day Worked: 09/01/2023"

   c. "Termination Date: 09/19/2023"

   d. Plaintiff was eligible for re-hire.

56. At no time between August 31, 2023, and September 17, 2023, did Balfour Defendants pay Plaintiff her final paycheck, or pay Plaintiff any wages whatsoever; however, a paystub dated September 18, 2023, was issued to Plaintiff for her remaining pay.

57. At the time of her termination, Plaintiff earned a salary of $60,000 per year, as well as benefits valued at 30% of her wages including medical/dental/vision insurance, a 401k retirement plan (with 2% match), time off (including vacation, personal and sick time, as well as 12 paid holidays + 1 floating holiday each year), and other miscellaneous benefits.

58. As such, Plaintiff's total compensation at the time of her termination was $78,000 per year, or $1,500.00 per week.

59. Because Plaintiff was highly qualified for the work she performed, Plaintiff was able to obtain a new position around October 1, 2023, which paid at $27.50 per hour, as well as delayed benefits representing approximately 15% of her total pay, which when Plaintiff works a forty hour week, equals compensation of $65,780 per year, or $1,265.00 per week.

60. Upon information and/or belief, Plaintiff -because of her success and qualifications- would have received a 5% increase in compensation in 2024 and again in 2025, had she continued to work for Balfour Defendants, resulting in compensation valued at ~$82,000 per year, or $1,577.00 per week (2024), and ~$86,000 per year, or $1,654 per week (2025).

61. As such, since October 1, 2023 through December 31, 2023 (13 weeks = $3,055), and then from January 1, 2024 through December 31, 2024 (52 weeks = $16,224), Plaintiff has lost ~65 weeks of compensation totaling $19,279.

62. In February 2024, Plaintiff applied for a Customer Experience Manager position at Balfour Defendants at Fort Carson, a position she was well qualified for given her previous experience with Balfour Defendants, having been first hired in April 2022 and having the job title Service Center Manager.

63. When Plaintiff interviewed for this position, the interview was very short.  Hearing nothing for weeks, she reached out twice to Balfour Defendants for a status update.  An assistant director in the department told her that the position was "on hold" to be filled, which is not common practice.

64. On or around May 1, 2024, Balfour Defendants emailed Plaintiff that the position had been filed.

65. Upon information, at least one individual involved in the decision not to hire/rehire Plaintiff was instructed by Balfour Defendants not to hire/rehire her or otherwise that under no circumstances would Plaintiff be offered the job because of her protected status/activities, including her recently filed (in October 2023) CCRD Charges of Discrimination against Balfour Defendants – which Balfour Defendants had full knowledge of by November 2023.

66. As a consequence of Defendants' above-mentioned actions/failures, Plaintiff has suffered economic damage as follows: back wages and compensation ($19,279); loss of economic opportunities and professional growth having to restart her career with a new employer ($50,000); future lost wages and compensation ($17,000 per year), and other forms of economic harm, estimated to total around $100,000.

67. As a consequence of Defendants' above-mentioned failures, Plaintiff has suffered significant emotional damages, including but not limited to the shock, shame, and

embarrassment of being terminated and escorted out like a criminal in front of her friends

and co-workers, amongst other emotional damages. Defendants' termination was like a

knife in Plaintiff's back for complaining about Defendants' discrimination, harassment,

and retaliation, and then a slap in her face when Defendants informed her that she was

eligible for rehire but refused to rehire her for her complaints to the CCRD. Plaintiff

presently seeks the maximum statutory amount for emotional damages totaling $300,000.

68. Defendants' above-mentioned failures and actions were willful and done with malice and

with reckless disregard to Plaintiff's civil rights and Defendants' requirements under the

law. Defendants engaged in unlawful discrimination, harassment, and retaliation that was

intentional. Plaintiff seeks punitive damages in the amount of no less than three times her

emotional damages, or $1,000,000.

69. Defendants were aware (or otherwise recklessly ignored) that their actions violated

Colorado and Federal law. Defendants' failures are despicable and reprehensible and

should be punished. Finally, Balfour Defendants is sizable, with over 500 employees.

70. As a consequence of Defendants' above-mentioned failures, Plaintiff has been forced to

retain counsel and pursue litigation, incurring costs and attorney's fees, which will likely

be $300,000 or more through trial.

71. All administrative remedies necessary for this action against Defendants have been

exhausted and this Complaint has been timely filed.


///

# VI. LEGAL CLAIMS

**FIRST CLAIM FOR RELIEF**
**Violation of Title VII – Discrimination on the basis of Race and Sex**
**42 U.S.C. § 2000e *et seq.***
**Against Balfour Defendants**

72. Plaintiff realleges and incorporates by reference each allegation contained in the paragraphs above, and by reference repleads and incorporates them as though fully set forth herein.

73. At all relevant times, Balfour Defendants qualified as Plaintiff's employers and Plaintiff qualified as Balfour Defendants' employee under Title VII, given that Balfour Defendants have 15 or more employees.

74. Protection against discrimination on the basis of race, racial association, and sex is provided by Title VII.

75. Title VII prohibits: "discriminat[tion]…because of … race, color…sex" in the "terms" or "conditions" of employment. The critical issue, Title VII's text indicates, is whether members of one sex or race are exposed to disadvantageous terms or conditions of employment to which members of the other sex or race are not exposed.

76. As alleged above, Plaintiff, a Black woman, is a member of a protected class.

77. As alleged above, Plaintiff complained to Balfour Defendants of discrimination, which qualifies as protected activities.

78. As alleged above, at all relevant times, Plaintiff performed her Service Center Manager position satisfactorily and successfully.

79. As alleged above, Plaintiff suffered adverse employment actions, including but not limited to discrimination on account of her protected statuses and activities.

80. As a direct and proximate result of the conduct of Balfour Defendants, Plaintiff's employment was terminated, and she suffered emotional anguish and distress, loss of income, loss of employment-related opportunities, and other special and general damages, all in an amount to be proven at trial.

81. At all relevant times and as alleged above, Balfour Defendants acted maliciously and willfully as they knew their conduct was prohibited by the law and/or Balfour Defendants showed a reckless disregard for whether their actions were prohibited under the law or not.

82. Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

**SECOND CLAIM FOR RELIEF**
**Violation of Title VII – Retaliation**
**42 U.S.C. § 2000e-3(a)**
**Against Balfour Defendants**

83. Plaintiff realleges and incorporates by reference each allegation contained in the paragraphs above, and by reference repleads and incorporates them as though fully set forth herein.

84. At all relevant times, Balfour Defendants qualified as Plaintiff's employers and Plaintiff qualified as Balfour Defendants' employee under Title VII, given that Balfour Defendants have 15 or more employees.

85. Protection against retaliation is provided by Title VII.

86. As alleged above, Plaintiff, a Black woman, is a member of a protected class.

87. As alleged above, Plaintiff complained to Balfour Defendants of discrimination and harassment which qualifies as protected activities.

88. As alleged above, Plaintiff was retaliated against because of her protected statuses and/or protected activities.

89. As a direct and proximate result of the conduct of Balfour Defendants, Plaintiff's employment was terminated, and she suffered emotional anguish and distress, loss of income, loss of employment-related opportunities, and other special and general damages, all in an amount to be proven at trial.

90. At all relevant times and as alleged above, Balfour Defendants acted maliciously and willfully as they knew their conduct was prohibited by the law and/or Balfour Defendants showed a reckless disregard for whether their actions were prohibited under the law or not.

91. Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

**THIRD CLAIM FOR RELEIF**
**Violation of Title VII**
**Harassment / Hostile Work Environment**
**Against All Defendants**

92. Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

93. At all relevant times, Balfour Defendants qualified as Plaintiff's employers and Plaintiff qualified as Balfour Defendants' employee under Title VII, given that Balfour Defendants have 15 or more employees.

94. Protection against harassment / hostile work environment is provided by Title VII.

95. The Tenth Circuit has recognized that the essence of either type of sexual harassment is not limited to conduct that has clearly sexual overtones. Instead, the basic question is

whether the conduct at issue was directed toward someone due to her or his gender. Thus,

"any harassment or other unequal treatment of an employee or group of employees that

would not occur but for the sex of the employee or employees may, if sufficiently

patterned or pervasive, comprise an illegal condition of employment under Title VII [or

the CADA]." *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987), *see also*

*Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1001 (10th Cir. 1996).

96. As alleged above, Defendants' conduct, by and through Shelton, complained of by

    Plaintiff was unwelcome, offensive, and based on or because of Plaintiff's sex.

97. As alleged above, Defendants' conduct, by and through Shelton, complained of by

    Plaintiff was sufficiently severe or pervasive to alter the terms and conditions of

    Plaintiff's employment by creating an abusive working environment.

98. As alleged above, Defendants knew or should have known about the conduct to which

    Plaintiff claims she was subjected and failed to implement reasonably prompt and

    appropriate corrective action. Notwithstanding the allegation that Balfour Defendants'

    Regional Manager engaged in this discrimination and harassment and that complaints

    were made about this discrimination to Balfour Defendants, at all times mentioned herein

    Defendants' agents, managers, and supervisors knew or should have known of this

    conduct by witnessing some of the discriminating events and through complaints of

    discrimination made by Plaintiff.

99. As alleged above, Defendants caused Plaintiff to be discriminated against because of her

    sex, to be sexually harassed, and to be retaliated against because of Plaintiff's sex and

    engagement in protected activities such as opposing/complaining of severe, pervasive,

    and/or oppressive discriminatory/harassing/retaliatory behaviors.

100. As alleged above, Defendants caused, allowed, and/or condoned Plaintiff to be discriminated against because of her sex, to be sexually harassed, and to be retaliated against for engaging in protected activities such as opposing discriminatory behaviors by allowing Shelton to continue to serve as Regional Manager, which allowed him to make continuous unwelcomed, insensitive, harassing comments to Plaintiff.

101. Defendants' acts, or lack thereof, caused a sexually discriminating, hostile work, and retaliatory environment.

102. As a direct and proximate result of the conduct of Defendants, Plaintiff's employment was terminated, and she suffered emotional anguish and distress, loss of income, loss of employment-related opportunities such as experience and increased reputation, and other special and general damages, all in an amount to be proven at trial.

103. At all relevant times and as alleged above, Defendants acted maliciously and willfully as they knew their conduct was prohibited by the law and/or Defendants showed a reckless disregard for whether their actions were prohibited under the law or not.

104. Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

**FOURTH CLAIM OF RELIEF**
**ADA/ADAAA 42 U.S.C. § 12112(b)**
**(a) Disability Discrimination, (b) Retaliation, and (c) Failure to Accommodate**

105. Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

106. At all relevant times, Balfour Defendants qualified as Plaintiff's employers and Plaintiff qualified as Balfour Defendants' employee under the ADA and the ADAAA.

107. At all relevant times, upon information and belief Balfour Defendants employed over
500 employees.

108. The ADA, 42 U.S.C. § 12112(a) provides: "No covered entity shall discriminate against
a qualified individual on the basis of disability in regard to job application procedures,
the hiring, advancement, or discharge of employees, employee compensation, job
training, and other terms, conditions, and privileges of employment."

109. Balfour Defendants violated the ADA when they, *inter alia,* unlawfully harassed and
discriminated against Plaintiff, terminated Plaintiff's employment and/or failed to
accommodate her actual and/or perceived disability by refusing to allow Plaintiff to
receive the necessary and low cost accommodations she sought for her actual and/or
perceived Balfour Defendants.

110. Centura is a "covered entity" as that term is defined in 42 U.S.C. § 12111(2), with, upon
information and belief, more than 500 employees. Balfour Defendants is also an
employer, as that term is defined in 42 U.S.C. § 12111(5)(A).

111. At all relevant times, Plaintiff was disabled, as she suffered from herniated/bulging
discs in her lower back and neck, including treatment and recovery therefrom, which
constituted an actual or perceived disability or medical condition that substantially
limited her in one or more of her major life activities, including but not limited to
sleeping, thinking and concentrating, and working.

112. At all relevant times, Plaintiff was a "qualified individual" as that term is used in §
12112(a). The ADA defines "qualified individual" as "an individual with a disability
who, with or without reasonable accommodation, can perform the essential functions of
the employment position that such individual holds or desires." Id. § 12111(8). At all

relevant times, Plaintiff was a qualified individual with a disability as she satisfied the

requisite skill, experience, education and other job-related requirements of her position

and she could perform the essential functions of her position.

113. At all relevant times, Plaintiff had a "disability," as that term is defined in the ADA. The

definition of "disability" includes having "a physical or mental impairment that

substantially limits one or more major life activities of such individual;" or "being

regarded as having such an impairment . . . Id. § 12102(1)(A), (C).

114. Plaintiff was disabled or Defendant perceived or otherwise regarded Plaintiff as being

disabled.

115. On August 31, 2023, Defendants terminated Plaintiff's employment as a final act of

disability discrimination.

116. As shown above, Defendants had no legitimate, nondiscriminatory reason for its

termination of Plaintiff's employment.

117. It is unknown whether Plaintiff's position was filled, but if it was, upon belief the

person who replaced Plaintiff -including her substantive duties- was less qualified, non-

disabled, was hired at a lesser salary, and did not request accommodation.

118. Plaintiff provided Defendants with sufficient information that, under the circumstances,

it is deemed to have known about Plaintiff's actual and/or perceived disability and her

desire for and need for accommodation.

119. Any accommodations Plaintiff would have utilized (such as an improved chair or

workstation set up) posed no undue hardship to Defendants.

120. Plaintiff herein makes claims pursuant to the ADA and the ADAAA for specifically, and independently, (a) disability discrimination, (b) retaliation, and (c) failure to accommodate.

121. At all relevant times and as alleged above, Defendants acted maliciously and willfully as it knew their conduct was prohibited by the law and/or Defendants showed a reckless disregard for whether their actions were prohibited under the law or not.

122. As a direct and proximate result of Defendants' unlawful termination and/or retaliation and/or failure to accommodate Plaintiff's actual and/or perceived disabilities, Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proven at trial.

123. Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

**FIFTH CLAIM OF RELIEF**
**Violation of the CADA**
**Including Violation of CADA's Protecting Opportunities and Workers' Rights (POWR)**
**Act, C.R.S. § 24-34-407**
**Discrimination, Harassment, Hostile Work Environment, and Retaliation on the basis of**
**Disability, Race and Sex, Failure to Accommodate, and Complaints of the Same**
**§§ 24-34-301 to 24-34-804, C.R.S.**
**Against All Defendants**

124. Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

125. At all relevant times, Balfour Defendants qualified as Plaintiff's employer and Plaintiff qualified as Balfour Defendants' employee under the CADA, given that Balfour Defendants are employers in the State of Colorado.

126. Protection against disability, race and sex-based discrimination, harassment, hostile work environment, and retaliation are provided by the CADA.

127. Individuals such as Shelton, including owners, managers, supervisors and co-workers, may be personally liable under the CADA for "aiding and abetting" discrimination, harassment, and retaliation, on the bases of disability, race and sex, and complaints thereof, in violation of the CADA.

128. As alleged above, Plaintiff, a Black woman, is a member of a protected class.

129. At all relevant times, Plaintiff was disabled, as she suffered from documented back-related medical issues, which constituted an actual or perceived disability or medical condition that substantially limited her in one or more of her major life activities, including, but not limited to sleeping, thinking and concentrating, and working.

130. At all relevant times, Plaintiff was a qualified individual with a disability as she satisfied the requisite skill, experience, education and other job-related requirements of the position and she could perform the essential functions of her position.

131. Plaintiff was disabled or Defendants perceived or otherwise regarded Plaintiff as being disabled.

132. Defendants violated the CADA when they, *inter alia,* unlawfully terminated Plaintiff's employment and/or failed to accommodate her actual and/or perceived disability by refusing to allow Plaintiff to seek or take leave to treat her actual and/or perceived disability, and harassing Plaintiff based on her disability.

133. Defendant violated the CADA when they, *inter alia,* unlawfully terminated Plaintiff's employment and/or failed to accommodate her actual and/or perceived disability or medical condition by refusing to allow Plaintiff to simply use certain tools/resources in

the workplace to allow her to productively work, for which Plaintiff at all times was

qualified for and should have received.

134. As alleged above, Plaintiff complained to Defendants of discrimination, harassment,

and/or retaliation, which qualifies as protected activities.

135. As alleged above, Plaintiff complained to the CCRD of Defendants' unlawful activities,

which qualifies as a protected activity, and on that basis or in conjunction with

Defendants' other acts of discrimination, harassment, and/or retaliation, Defendants

retaliated against Plaintiff by refusing to re-hire her.

136. As alleged above, at all relevant times, Plaintiff performed her Service Center Manager

position satisfactorily and successfully.

137. As alleged above, Plaintiff suffered adverse employment actions, including but not

limited to race, sex, and disability discrimination, harassment, and retaliation on account

of her protected statuses and activities.

138. As a direct and proximate result of the conduct of Defendants, Plaintiff's employment

was terminated, and she suffered emotional anguish and distress, loss of income, loss of

employment-related opportunities, and other special and general damages, all in an

amount to be proven at trial.

139. At all relevant times and as alleged above, these Defendants acted maliciously and

willfully as they knew their conduct was prohibited by the law and/or Defendants showed

a reckless disregard for whether their actions were prohibited under the law or not.

140. Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this

pleading.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief against

Defendants, and any or all of them, as applicable under the law:

   a. Award Plaintiff economic and compensatory damages, in an amount to be shown;
   b. Award Plaintiff emotional damages, in an amount to be shown;
   c. Award Plaintiff consequential damages, in an amount to be shown;
   d. Award punitive or exemplary damages, in an amount to be shown;
   e. Award Plaintiff pre-judgment and post-judgment interest;
   f. Award Plaintiff the costs of this action together with reasonable attorneys' fees; and
   g. Award such other and further relief as this Court deems necessary and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury on all questions of fact raised by the complaint.

Respectfully submitted this 23rd day of December 2024.

*/s/ Christopher G. Wilhelmi*
_____
Christopher G. Wilhelmi
Attorney for Plaintiff
Colorado Law Group
121 East Vermijo Ave, Suite 200
Colorado Springs, CO 80903
E-mail: chris@coloradolawgroup.com